1

2

3

4

5

6                         **UNITED STATES DISTRICT COURT**

7                              **DISTRICT OF NEVADA**

8

9
   MARK RONALD PRAY,                    )
10                                       )
                  Petitioner,            )        3:03-cv-00608-JCM-VPC
11                                       )
   vs.                                   )        **ORDER**
12                                       )
   CRAIG FARWELL, *et al.*,              )
13                                       )
                  Respondents.           )
14 _____/

15         Before the court for a decision on the merits is an application for a writ of habeas corpus filed

16 by Mark Ronald Pray, a Nevada prisoner.  ECF No. 56.

17         I.  FACTUAL AND PROCEDURAL HISTORY

18         In 1996, Pray was convicted of murder in the first degree with use of a deadly weapon and

19 sentenced to two consecutive life sentences with the possibility of parole.  The facts of Pray's case

20 are recounted in Nevada Supreme Court's decision on his direct appeal:

21              Appellant Mark Pray ("Pray") and his ex-wife, Marjorie Pray ("Marjorie"),
        were travelling north in an automobile on I-15 on their way to Mesquite, Nevada,
22      when, by their own account, they noticed that an Isuzu pickup truck seemed to be
        following them.  In an unsuccessful attempt to evade their pursuer, Pray began driving
23      fast and executed a series of U-turns, crossing from the northbound to the southbound
        lanes of I-15.  Finally, Pray slammed on his brakes, turned onto the median, and fired
24      six shots from his .357 caliber revolver at the oncoming vehicle.  One of the shots
        struck the driver of the vehicle, Peter Ghiglione, II ("Ghiglione") in the head, killing
25      him.  Pray later told the police that he believed the man following him in the Isuzu
        pickup was William "Bud" Baker ("Baker").  Baker had previously been in a
26      relationship with Marjorie.  According to Pray, he had a confrontation with Baker

several weeks before the shooting in which Baker had threatened him with a handgun. Pray stated that he felt that Baker was going to harm Marjorie and him.

After the shooting, Pray and Marjorie drove around for several hours, then checked into a motel in Pahrump. They then went to a bar and had several drinks. Pray and Marjorie then drove toward Las Vegas. At one point during the drive, Pray became angry and struck Marjorie, giving her a black eye. Pray told her to say that she hit her eye on the dashboard.

They later returned to the motel in Pahrump. At the motel, Pray thought that he saw one of Baker's friends, a man named Angel. Pray got his pistol out of the truck and returned to their room. Marjorie called motel security and then the police.

Officers of the Nye County Sheriff's Office arrived at the motel, and Pray informed them of his fears. Pray and Marjorie were taken into protective custody. The officers searched the area around the motel and found a person matching Angel's description. The officers soon learned that this person was Las Vegas Metropolitan Police Officer Larry Huggins, who was staying in Pahrump while participating in a police officer's golf tournament.

The police eventually questioned Pray about the Ghiglione shooting. Pray told the police that he and Marjorie were on their way to Mesquite at the time of the shooting because he had seen Baker lurking around their apartment in North Las Vegas. William Shouse ("Shouse"), who was with Pray and Marjorie at their apartment, testified that he checked outside and did not see Baker anywhere about. Shouse told Pray that Baker was not outside, but Pray did not believe him. Shouse then called Baker's residence and awakened him, ascertaining that he was, in fact, at home and not lurking near Pray's house. Shouse told Pray that Baker was at home, but still Pray refused to believe him.

Marjorie testified that she told Pray that the pickup truck was not Baker's pickup truck; it was too small. She also testified that she never saw the face of the man in the pickup truck and never saw any weapon in the man's possession. Neither the man who subsequently discovered Ghiglione's body nor the police found any weapon in the truck.

Pray and Marjorie admitted that prior to leaving their apartment, they had been smoking crack cocaine and drinking. Shouse also testified that Pray was "tweaking" quite a bit at this time. Shouse described "tweaking" as a crack-induced state of nervous paranoia. Shouse said that "tweaking" is a sign that one has smoked too much crack cocaine. Marjorie testified that Pray was a frequent "tweaker."

At trial, Pray claimed justifiable homicide as a defense. . . .

*Pray v. State*, 959 P.2d 530, 531 (Nev. 1998).

The Nevada Supreme Court affirmed the conviction and sentence. *Id*. at 532. On August 3, 1998, Pray filed a post-conviction petition for writ of habeas corpus in the state district court. The

2

1  court found insufficient information and allegations in the petition to justify an evidentiary hearing

2  and issued a written denial in June of 1999.

3         Pray appealed.  On July 7, 2000, the Nevada Supreme Court affirmed the dismissal in part

4  and remanded the matter to the state district court to conduct an evidentiary hearing on Pray's claim

5  that members of the jury interacted with the state's investigator and the victim's family during the

6  trial.  The Nevada Supreme Court denied Pray's petition for rehearing.

7         The state district court held an evidentiary hearing in May of 2001.  In June of 2002, the court

8  issued a written order denying the post conviction relief, in which it found, based on the testimony

9  and affidavits of the jurors, that there appeared to be no misconduct by the jurors and no private

10 communication between the victim's family members and the jurors.  Pray appealed.  In August of

11 2003, the Nevada Supreme Court upheld the denial of Pray's state habeas petition.

12        Pray mailed his *pro se* federal petition for writ of habeas corpus to this court on November 5,

13 2003.  ECF No. 6.  The court appointed counsel; and, on December 21, 2004, Pray filed his first

14 amended petition (ECF No. 16).

15        Respondents moved to dismiss the petition.  ECF No. 31.  This court granted respondents'

16 motion in part, finding Grounds Two, Six(D), Six(F), and Six(G)(2) to be unexhausted.  ECF No. 48.

17 Pray moved for stay and abeyance in order to pursue exhaustion, which this court granted.  ECF Nos.

18 49-51.

19        On September 1, 2006, Pray filed his second state habeas petition, which the state then

20 moved to dismiss.  The state district court denied the petition, finding that it was time

21 barred pursuant to NRS 34.726, successive pursuant to NRS 34.810, and barred by the doctrine of

22 laches pursuant to NRS 34.800.  The court further found that Pray failed to demonstrate

23 actual cause or substantial prejudice to overcome the procedural bars.

24        Pray appealed.  The Nevada Supreme Court affirmed the district court's decision to deny the

25 petition.  On July 16, 2008, Pray moved to reopen the federal case before this court.  ECF No.  52.

26

3

1   The court having granted the motion, Pray filed his second amended petition for writ of habeas

2   corpus on January 13, 2009.  ECF No. 56.  On May 1, 2009, respondents filed a motion to dismiss

3   claiming that the petition is a mixed petition and that many of the claims are time-barred or

4   procedurally barred.  ECF No. 61.  Pursuant to that motion, this court dismissed several claims from

5   the second amended petition.  ECF No. 77.  Grounds Three, Five, Six(A), Six(B), Six(C), Six(E),

6   Six(G)(1), Six(H), Six(I), and Seven remain before the court for a decision on the merits.

7       II.  STANDARDS OF REVIEW

8       This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).  28

9   U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

10          An application for a writ of habeas corpus on behalf of a person in custody
            pursuant to the judgment of a State court shall not be granted with respect to any
11          claim that was adjudicated on the merits in State court proceedings unless the
            adjudication of the claim –
12
            (1)  resulted in a decision that was contrary to, or involved an unreasonable
13          application of, clearly established Federal law, as determined by the Supreme Court of
            the United States; or
14
            (2)  resulted in a decision that was based on an unreasonable determination of
15          the facts in light of the evidence presented in the State court proceeding.

16   28 U.S.C. § 2254(d).

17       A decision of a state court is "contrary to" clearly established federal law if the state court

18   arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the

19   state court decides a case differently than the Supreme Court has on a set of materially

20   indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  An "unreasonable

21   application" occurs when "a state-court decision unreasonably applies the law of [the Supreme

22   Court] to the facts of a prisoner's case."  *Id*. at 409.  "[A] federal habeas court may not "issue the

23   writ simply because that court concludes in its independent judgment that the relevant state-court

24   decision applied clearly established federal law erroneously or incorrectly."  *Id*. at 411.

25

26

4

1    The Supreme Court has explained that "[a] federal court's collateral review of a state-court

2    decision must be consistent with the respect due state courts in our federal system." *Miller–El v.*

3    *Cockrell*, 537 U.S. 322, 340 (2003).  The "AEDPA thus imposes a 'highly deferential standard for

4    evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the

5    doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7

6    (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).  "A state court's determination

7    that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'

8    on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, 786 (2011)

9    (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  The Supreme Court has emphasized

10   "that even a strong case for relief does not mean the state court's contrary conclusion was

11   unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v.*

12   *Pinholster*, 131 S.Ct.1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and

13   highly deferential standard for evaluating state-court rulings, which demands that state-court

14   decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

15   "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that

16   adjudicated the claim on the merits." *Pinholster*, 131 S.Ct. at 1398.  In *Pinholster*, the Court

17   reasoned that the "backward-looking language" present in § 2254(d)(1) "requires an examination of

18   the state-court decision at the time it was made," and, therefore, the record under review must be

19   "limited to the record in existence at that same time, i.e., the record before the state court." *Id*.

20   For any habeas claim that has not been adjudicated on the merits by the state court, the

21   federal court reviews the claim *de novo* without the deference usually accorded state courts under 28

22   U.S.C. § 2254(d)(1).  *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313

23   F.3d 1160, 1167 (9th Cir. 2002).  *See also James v. Schriro*, 659 F.3d 855, 876 (9th Cir. 2011) (noting

24   that federal court review is *de novo* where a state court does not reach the merits, but instead denies

25   relief based on a procedural bar later held inadequate to foreclose federal habeas review).  In such

26

5

instances, however, the provisions of 28 U.S.C. § 2254(e) still apply.  *Pinholster*, 131 S.Ct at 1401

("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas

relief."); *Pirtle*, 313 F.3d at 1167-68 (stating that state court findings of fact are presumed correct

under § 2254(e)(1) even if legal review is *de novo*).

Lastly, the Court in *Lockyer* rejected a Ninth Circuit mandate for habeas courts to review

habeas claims by conducting a *de novo* review prior to applying the "contrary to or unreasonable

application of" limitations of 28 U.S.C. § 2254(d)(1).  *Lockyer*, 538 U.S. at 71.  In doing so,

however, the Court did not preclude such an approach.  "AEDPA does not require a federal habeas

court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) –

whether a state court decision is contrary to, or involved an unreasonable application of, clearly

established Federal law."  *Id.*

III.  ANALYSIS OF CLAIMS

**Ground Three**

In Ground Three, Pray claims that his constitutional rights have been violated because there

was not sufficient evidence to convict him of first degree murder.  The Nevada statutes define first

degree murder, in relevant part, as a "willful, deliberate and premeditated killing."  Nev. Rev. Stat. §

200.030(1)(a).  According to Pray, the evidence presented at trial supported his claim of self-defense

and failed to establish that he intended to kill Peter Ghiglione

The standard used by the federal habeas court to test whether sufficient evidence supports a

state conviction is the "rational factfinder" standard established in *Jackson v. Virginia*, 443 U.S. 307

(1979).  *Mikes v. Borg*, 947 F.2d 353, 356 (9TH Cir. 1991).  Under that standard, the court inquires as

to "whether, after viewing the evidence in the light most favorable to the prosecution, any rational

trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

*Jackson*, 443 U.S. at 319 (citation omitted).

In addressing Pray's sufficiency of evidence claim on direct appeal, the Nevada Supreme

Court ruled as follows:

> . . . Pray argues that insufficient evidence existed to convict him of first-degree murder because "there is nothing to support or even suggest that [he] meant to kill anyone when the shots were fired in what he believed was an attempt to prevent injury to himself or Marjorie." Pray further contends that the "keystone cop nature of the entire chase mitigates against the actions being first-degree murder."
>
> It is well settled that this court will not overturn a criminal conviction for lack of sufficient evidence so long as "the jury, acting reasonably, could have been convinced of the defendant's guilt beyond a reasonable doubt by the evidence that was properly before it." *Lay v. State*, 110 Nev. 1189, 1192, 886 P.2d 448, 450 (1994).
>
> In the present case, the State presented evidence that Pray turned his vehicle around on the highway median and fired six shots from a large caliber handgun at the driver's compartment of Ghiglione's oncoming vehicle. We conclude that from this evidence, a reasonable jury could have found the intent required for first-degree murder.

ECF No. 21, p. 78-79.[1]

Under Nevada law, "the intention to kill may be ascertained or deduced from the facts and circumstance of the killing, such as the use of a weapon calculated to produce death, the manner of use, and the attendant circumstances characterizing the act." *Moser v. State*, 544 P.2d 424, 426 (Nev. 1975). Beyond the evidence cited by the Nevada Supreme Court in rejecting this claim, additional evidence supported a finding that Pray was not acting in self-defense; that being Marjorie's testimony that she told Pray that the pickup truck was not Baker's pickup truck, that she never saw the face of the man in the pickup truck, and that she never saw any weapon in the victim's possession. The evidence also established that Pray bypassed the chance to stop in a populated area, did not contact authorities after the shooting, and admitted to an investigating detective that he never saw the victim with a gun.

This court concludes that there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Pray's conduct satisfied the elements of first degree murder under Nevada law.

---

[1] References to page numbers in the record are based on CM/ECF pagination.

1  Thus, Pray is not entitled to habeas relief under the *Jackson* standard, especially in light of the extra

2  layer of deference imposed by AEDPA.  *See Boyer v. Belleque*, 659 F.3d 957, 964 -65 (9th Cir.

3  2011) (noting that "the state court's application of the *Jackson* standard must be 'objectively

4  unreasonable' to warrant habeas relief for a state prisoner).

5                                              **Ground Five**

6          In Ground Five, Pray contends that his constitutional rights were violated because the jury

7  instruction defining implied malice created an improper presumption, thereby minimizing the State's

8  burden of proof.  The challenged instruction read as follows:

9                  Express malice is that deliberate intention unlawfully to take away the life of a
                   fellow creature, which is manifested by external circumstances capable of proof.
10
                   Malice shall be implied when no considerable provocation appears, or when
11         all the circumstances of the attempted killing show an abandoned and malignant
           heart.
12

13  ECF No. 20, p. 245.  Pray argues that the instruction, while consistent with the definition of malice

14  contained in the Nevada statute (i.e., Nev. Rev. Stat. § 200.020), involved a presumption governed

15  by Nev. Rev. Stat. § 47.320 and, therefore, necessitated an instruction that its existence must be

16  proved beyond a reasonable doubt.  According to Pray, the instruction violated his constitutional

17  rights by creating a reasonable likelihood that the State would be relieved of its burden to prove each

18  element of the crime beyond a reasonable doubt.

19         In *Estelle v. McGuire*, 502 U.S. 62 (1991), the Supreme Court outlined the proper inquiry for

20  determining the constitutional validity of a jury instruction:

21                  . . . [T]he fact that the instruction was allegedly incorrect under state law is not
           a basis for habeas relief.  Federal habeas courts therefore do not grant relief, as might
22         a state appellate court, simply because the instruction may have been deficient in
           comparison to the [state's model instructions].  The only question for us is "whether
23         the ailing instruction by itself so infected the entire trial that the resulting conviction
           violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  It is well
24         established that the instruction "may not be judged in artificial isolation," but must be
           considered in the context of the instructions as a whole and the trial record. *Cupp v.*
25         *Naughten*, *supra*, 414 U.S., at 147.  In addition, in reviewing an ambiguous
           instruction such as the one at issue here, we inquire "whether there is a reasonable

26

                                                      8

1    likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. *Boyde v. California*, 494 U.S. 370, 380 (1990). And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Ibid*.

502 U.S. at 71-72.

In adjudicating this claim on direct appeal, the Nevada Supreme Court concluded:

Pray also argues that the jury instructions regarding deliberation and implied malice were constitutionally infirm. However, we have previously rejected both these contentions. *See Doyle v. State*, 112 Nev. 879, 900, 921 P.2d 901, 915 (1996) (reaffirming the holding of *Powell v. State*, 108 Nev. 700, 838 P.2d 921 (1992)).

ECF No. 21, p.80. In *Doyle*, the Nevada Supreme Court held that any ambiguity as to the State's burden of proof arising from the challenged instruction was cured by a separate instruction that "[t]he defendant is presumed innocent until the contrary is proved" and that "[t]his presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged." *Doyle*, 921 P.2d at 901-02. The jury in Pray's case was issued a nearly identical instruction. ECF No. 20, p. 274.

Pray provides no argument as to how the Nevada Supreme Court's decision is contrary to, or an unreasonable application of, clearly established federal law. In the absence of any Supreme Court precedent directing, or even suggesting, a different outcome, the state court decision must be accorded deference under § 2254(d)(1). *See Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008); *see also Carey v. Musladin*, 549 U.S. 70, 76–77 (2006).

Moreover, any error arising from the jury instruction is harmless. The jury in Pray's case found him guilty of first degree murder because it found that the murder was a willful, deliberate, and premeditated act. The elements of willfulness, premeditation, and deliberation conclusively establish express malice, with no need to rely upon implied malice. *Scott v. State*, 554 P.2d 735, 738 (Nev. 1976).

9

1    Ground Five is denied.

2    **Ground Six**

3    In Ground Six, Pray claims that he was denied his constitutional right to effective assistance

4    of counsel due to various acts and omissions committed by counsel throughout the course of the

5    criminal proceedings against him.

6    In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two

7    prong test for analysis of claims of ineffective assistance of counsel: a petitioner claiming ineffective

8    assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an

9    objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced

10   the defendant such that "there is a reasonable probability that, but for counsel's unprofessional

11   errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.

12   *Ground Six(A)*

13   Ground Six(A) alleges that counsel's failure to object to various instances of prosecutorial

14   misconduct constituted ineffective assistance of counsel.  These instances include one point during

15   trial when the prosecutor argued that a written statement provided by a certain witness was work

16   product (and therefore inadmissible) and four separate points during closing argument when the

17   prosecutor made allegedly improper comments.

18   As to the former, Pray cites to the following:

19       Very well, Your Honor.  I would note for the record though that the item is
20   work product when I discovered Mr. Shouse as a witness.  Just as Mr. Smith could
     have done at any time in this case, I had my investigator and he sit down and have
21   him jot down some of the things he remembered.  So the Court should know that is
     exactly what that is, attorney work product.  I do not acquiesce to Mr. Smith
22   introducing my work product into evidence since in the past two and a half years he
     could have generated his own work product.

23       . . .

24       This was not discovery in the ordinary course of a police investigation in this
     matter.  This was merely done by Mr. Lovelace, my investigator and I finding Mr.
25   Shouse, going out and talking and having him jot down notes which Mr. Smith could

26

                                          10

1    do.  And I don't believe I've received anything from any of the witnesses that Mr.
2    Smith has spoken to.

3  ECF No. 19, p. 124-25.  With respect to the prosecutor's closing argument, Pray claims these

4  comments improperly tried to quantify reasonable doubt and urged the jury to put a value on human

5  life:

6         In this particular case, the word 'reasonable' is not defined in the instructions.
       In fact, it's your life experiences that you bring to this jury that are going to have to be
7      used to determine and define the word 'reasonable.'  To do that, you're going to have
       to, in fact, put a value on human life and determine what type of circumstances justify
8      the taking of that human life.

9  ECF No. 20, p. 140-41.  He claims that this was an improper personal opinion as to the defendant's

10 guilt:

11        The truly [sic] only question in this case is was the killing of Peter Ghiglione
       justified as being a killing in self-defense.  Obviously, I say it was not.
12

13 *Id.*, p. 146.  He claims these comments were improper because prosecutor stated that the defendant

14 was lying and implicitly referred to the fact that Pray did not testify at trial:

15        But all those people are lying.  But the man–the one man with the motive to
       fabricate here, the one man whose, as Mr. Smith put it, life is on the line, he is telling
16     the truth.  Him, you should believe, but all these people who came to court and sat
       under oath and told you these things with no motive to fabricate, they're lying.
17     They're lying.

18 *Id.*, p. 210.  He claims these comments were improper because they indirectly called attention to

19 Pray's decision to not testify:

20        Now, let's talk about the defendant, Mr. Consistent – let's talk about what he
       has to say in this case.  Well, we got his first little work of authorship, the note from
21     the Saddle West, and I read: 'I cut through the median four times with him gaining on
       us. The last trip through the median he was aiming a gun.'  Signed, M.P.
22
          Aiming a gun. I didn't hear anything about loaded fingers, and I'm not reading
23     anything about loaded fingers here.  Aiming a gun.  Even spelled gun right, to make
       sure.  No 'I thought I saw a gun', no nothing.  A gun.  And we know Pete Ghiglione
24     didn't have a gun. Does that seem secure?  Pete didn't even own any gun, and he
       didn't have a gun that night, and that's not in dispute.  But the defendant saw a gun.
25

26

1    But then to Detective Huggins, he saw a gun and then he saw something.  And
then to Detective Jackson, 'I didn't see a gun.'  Well, which is it, Mr. Defendant, did
2    you see a gun or did you not see a gun?  Was it a finger shaped like a gun?  What was
it?  I guess nobody beat you into your story.  So at Saddle West on the paper, it's a
3    gun.  To Huggins, it might be a gun.  To Jackson, it's never a gun.  To Margie, at first
there was a gun, then I guess there's no gun.

4

5    We know the story, ladies and gentlemen, there's no gun.  This is the man
with the motive to fabricate.  Oh, while everybody else is lying, everybody else is
6    making stuff up about this poor guy, this guy is the one.  The gun, not a gun, gun, not
a gun.

7    *Id.*, p. 216-18.

8    Pray presented the foregoing claim of ineffective assistance of counsel to the Nevada

9    Supreme Court in his first state post-conviction proceeding.  The state supreme court addressed the

10    claim as follows:

11    Pray argues that he received ineffective assistance of counsel because his
attorney failed to object to several instances of alleged prosecutorial misconduct at the
12    trial.  [Footnote1 – Due to trial counsel's failure to object to the five alleged instances
of prosecutorial misconduct, this court declined to review the allegation on direct
13    appeal.  *See Pray v. State*, 114 Nev. 455, 459, 959 P.2d 530, 532 (1998).]  Pray first
argues that the prosecutor committed misconduct by arguing that notes, which
14    indicated when the State discovered a certain witness, were work product and
therefore not admissible at trial.  We conclude that the prosecutor offered a reasonable
15    legal argument detailing his basis for claiming that the notes were work product.
Second, Pray fails to claim any prejudice suffered simply because his attorney failed
16    to object to this legal argument.  Pray does not even suggest on what grounds his
attorney should have objected.  In fact, Pray merely quotes the argument made by the
17    prosecutor and then concludes that his attorney was ineffective for failing to object.
Therefore, we hold that Pray has failed to demonstrate that trial counsel was deficient.

18

19    Second, Pray argues that he received ineffective assistance of counsel because
his trial counsel failed to object when the prosecutor improperly defined the
20    reasonable doubt standard.  However, Pray only includes a portion of the prosecutor's
statement as evidence that he improperly attempted to quantify the reasonable doubt
21    standard.  After a thorough review of the record, we conclude that it is clear that the
prosecutor was not attempting to quantify or define the reasonable doubt standard.  In
22    fact, it is quite clear that the prosecutor was referring to the reasonableness of Pray's
actions the night of the shooting and that his comments had nothing to do with the
23    reasonable doubt standard, as claimed by Pray.  Therefore, we conclude that Pray has
failed [to] establish that trial counsel was deficient.

24    Third, Pray claims that the prosecutor improperly injected his personal beliefs
into the proceedings.  During closing arguments, the prosecutor stated:

25

26

12

The truly only question in this case is was the killing of Peter Ghiglione justified as being a killing in self-defense?  Obviously, I say it was not.  The instructions that you have on that point helping you understand the law of self-defense are set forth in Instructions 28 through 34, and you can refer to those when you go back.  [Footnote2 – Again, counsel for Pray fails to include the full context of the quotation, only quoting the most suspect portion of the statement.]

This court has held that a prosecutor should not inject his personal opinion into an argument before the jury. *See Aesoph v. State*, 102 Nev. 316, 332, 721 P.2d 379, 383 (1986).  However, Pray fails to demonstrate that he suffered any prejudice from the failure of his attorney to object to this statement of the prosecutor.  The statement of the prosecutor was merely a statement of the obvious position of the State; that this was not an incident of self-defense; otherwise, the State would not have charged Pray with first-degree murder.  Additionally, the prosecutor does not divert the jury's attention from their proper focus.  In fact, the prosecutor references the relevant instructions that the jury should examine in deciding the issue of self-defense.  Also, the prosecutor's statement does not appear to rise to the level of misconduct as that term is defined in Nevada cases. *See Collier v. State*, 101 Nev. 473, 478, 705 P.2d 1126, 1129 (1985) (case remanded for a new penalty hearing because the prosecutor's comments "sought to promote a conclusion that Collier's rehabilitation was improbable, that he might well kill again while in prison, and that he should therefore be put to death").  Therefore, we conclude that Pray has failed to demonstrate that trial counsel was deficient.

Further, Pray argues that the prosecutor improperly alluded to the fact that Pray lied or had motive to fabricate and also commented on Pray's failure to testify at trial.  The questionable statements were made during the State's rebuttal closing remarks, in response to defense counsel calling into question the veracity and reliability of the State's witnesses.  However, the district court instructed the jury to ignore the opinions of counsel offered during argument.  Further, Pray has failed to show that he suffered any prejudice from the alleged prosecutorial misconduct.  Finally, after extensive review of the record, we are unable to find any reference, implied or explicit, to Pray's failure to testify.  Therefore, we conclude that Pray has failed to establish that trial counsel was deficient.

ECF No. 21, p. 344-47.

Applying the § 2254(d) standard to the state court's decision, there are ample grounds upon which fair-minded jurists could agree with the state court's determinations that either counsel's performance did not fall below an objective standard of reasonableness or that Pray was not prejudiced by counsel's failure to object.  The prosecutor's argument regarding the admissibility of the witness's statement was nothing more than an argument as to an evidentiary matter to which

1  Pray's counsel responded.  ECF No. 19, p. 124-25.  The Nevada Supreme Court was correct in

2  concluding that the comments were neither objectionable, nor prejudicial.

3      The Nevada Supreme Court was also correct in noting that the prosecutor's comments about

4  the how to define "reasonable" were in relation to the defendant's conduct, not the standard of proof

5  required to find the defendant guilty.  ECF No. 20, p. 140-41.  Pray cites to no legal authority to

6  support his claim that the prosecutor's comment about the jury placing a value on human life was

7  prosecutorial misconduct.  Likewise, to the extent the prosecutor's remark that the killing was not

8  justifiable as self-defense was an improper expression of his personal opinion, it was so fleeting and

9  innocuous that it could hardly be characterized as prejudicial prosecutorial misconduct.

10     Lastly, the Nevada Supreme Court's determinations that the prosecutor's statements about

11 Pray lying and his failure to testify were also a reasonable application of federal law.  During closing

12 argument, the prosecutor is permitted to argue reasonable inferences based on the evidence.  *United*

13 *States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).  And, like the Nevada Supreme Court, this

14 court is unable to locate any mention, explicit or implicit, of Pray's failure to testify at trial.  If

15 anything, an objection from defense counsel would have only risked drawing the jury's attention to

16 the fact.

17     Pray is not entitled to relief based on Ground Six(A).

18     *Ground Six(B)*

19     Ground Six(B) alleges that counsel rendered ineffective assistance by telling the jury, in his

20 opening statement, that Pray would testify, then deciding to not call him as a witness.  During his

21 opening statement, defense counsel made several references to anticipated testimony from Pray.

22 ECF No. 19, pp. 55, 57, 60, 61-63.  Counsel told the jury that Pray's testimony would provide a more

23 credible account of the confrontation several weeks before the shooting in which Baker pointed a

24 gun at Pray and would establish that Pray never approved of Baker visiting his home, that Baker was

25 on the other side of his door with a gun and a bottle on the night of the shooting, and that Pray

26

14

1   suspected that Baker was following them on the night of the shooting.  *Id*.  Toward the end of the

2   trial, the court informed Pray of his constitutional right against self-incrimination.  ECF No 20, p.

3   91-94.  Defense counsel then notified the court that Pray would not testify.  *Id*., p. 95-96.

4      Pray presented this claim to the Nevada Supreme Court in his first state post-conviction

5   proceeding.  The state supreme court addressed the claim as follows:

6        Pray also alleges that his attorney was ineffective for failing to call Pray as a
     witness.  The district court noted that Pray was canvassed by the district court
7    regarding his right to testify or not testify, that Pray indicated that he understood that
     right, and that he decided to not testify.  Although trial counsel did state that Pray
8    would testify during opening statements, Pray has failed to demonstrate that his
     counsel was deficient by advising Pray to not take the stand in his own defense.  *See*
9    *Doleman v. State*, 112 Nev. 843, 848, 921 P.2d 278, 280-81 (1996) (holding that trial
     counsel's strategy decisions are not subject to challenge absent extraordinary
10   circumstances).

11   ECF No. 21, p. 348.

12      Given the conflicting statements Pray had given the police and the evidence that he was

13   "tweaking" on the day of the shooting, counsel certainly had legitimate reasons for not calling Pray

14   as a witness.  Thus, the state supreme court may have been reasonable in concluding that counsel

15   was not ineffective in failing to call Pray as a witness.  However, the court did not address the crux

16   of Pray's claim – i.e., that counsel created an expectation for the jury that he subsequently failed to

17   meet.

18      Unfulfilled promises by defense counsel to present personal testimony from a criminal

19   defendant are highly suspect under *Strickland*.  *Barrow v. Uchtman*, 398 F.3d 597, 606–07 (7th Cir.

20   2005); *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 257–60 (7th Cir. 2003).   Viewed in

21   isolation, counsel's decision to not call Pray as a witness is a strategic decision well within the

22   bounds objective standards of reasonableness.  Far less defensible is counsel telling the jury that Pray

23   would testify about the events surrounding the shooting, then not calling him as a witness.

24      Even so, this court is not convinced that there is a strong possibility that counsel's error

25   affected the outcome of the trial.  *See Strickland*, 466 U.S. at 693–94.  The prejudice that potentially

26

1    results from promising testimony then not presenting it is that the jury may infer that the testimony

2    would have been adverse to the defense.  *Hampton*, 347 F.3d at 259-60.

3         *Hampton* and *Ouber v. Guarino*, 293 F.3d 19 (1st Cir. 2002), are the two cases cited by Pray

4    in which counsel failed to deliver defendant's testimony as promised and the court concluded that

5    habeas relief was warranted.  In both those cases, the court unequivocally found attorney error, but

6    the circumstances were such that the amount of prejudice needed to change the outcome of the case

7    was not great.  In *Hampton*, counsel's unfulfilled promise regarding the defendant's testimony

8    merely added to a more serious error by counsel.  347 F.2d at 260 ("Although we agree with the

9    district court that [counsel's] breach of the promises he made in the opening statement was not so

10   prejudicial that it would support relief in and of itself, the breach serves to underscore the more

11   important failure to investigate exculpatory occurrence witnesses.").  In *Ouber*, the trial at issue was

12   defendant's third and her two prior trials, at which she did testify, ended in hung juries.  293 F.3d at

13   35 ("[T]his was the petitioner's third trial and the only salient difference between it and the two prior

14   trials was the absence of her testimony.").

15        As noted above, the jury in this case had ample grounds, aside from counsel's failure to

16   deliver promised testimony, to discredit Pray's theory of self-defense, including the testimony of an

17   eye-witness, Marjorie, and Pray's own statements to the police.  Moreover, counsel did not, in his

18   opening statement, emphasize Pray's anticipated testimony as central to the defense's case, but

19   instead mentioned it, for the most part, in relation to tangential issues.  *Cf. Ouber*, 293 F.3d at 22

20   (noting that counsel told the jury:  "The case is going to come down to what happened in that car and

21   what your findings are as you listen to the credibility and the testimony of [undercover agent] Todd

22   Shea versus what your findings are as you listen to the testimony of [defendant] Barbara Ouber.").[2]

23

24   _____

     [2]  Defense counsel in *Ouber* also told the jury, referring to Shea and the defendant: "And you're
25   going to have to decide the truth and veracity of those two witnesses; and that will be your ultimate
     decision in this case."  *Id*.
26

1    Unlike in the cases cited by Pray, there is not a reasonable probability that counsel's comments about

2    Pray testifying changed that outcome of the proceeding.

3         Pray is not entitled to relief based on Ground Six(B).

4         *Ground Six(C)*

5         Ground Six(C) alleges that counsel's failure to call witnesses to establish crucial facts for the

6    defense constituted ineffective assistance of counsel.  According to Pray, effective counsel would

7    have called several witnesses that his counsel did not – i.e., a defense investigator (Jim Thomas ), a

8    passing motorist who allegedly witnessed the shooting (Neil Stiller), Ghiglione's girlfriend (Michelle

9    Richards), Michelle Richards' brother (Alan Richards), Marjorie Pray, and a friend of Pray's who

10   also knew William Baker (Stephen Jackson).

11        Pray presented this claim to the Nevada Supreme Court in his first state post-conviction

12   proceeding.  The state supreme court addressed the claim as follows: :

13        Pray next argues that trial counsel was ineffective for failing to call several
     specific witnesses.  Pray alleges that trial counsel was ineffective for not calling
14   Marjorie Pray to testify.  We note that the record very clearly states that Marjorie was
     unable to be located for the trial, and testimony given by Marjorie at the preliminary
15   hearing was read into the record.  Therefore, we conclude that trial counsel was not
     ineffective for failing to call Marjorie.
16
          Pray also alleges that trial counsel was ineffective for failing to call Neil
17   Stiller to testify that he observed shots being fired from both Pray's and Ghiglione's
     vehicles in the median.  We find that the allegation of shots being fired from both
18   vehicles is repelled by the record, because no weapons were found in Ghiglione's
     truck, there was no damage to Pray's truck from bullet holes, neither Pray nor
19   Marjorie received any injuries, and, finally, the man who discovered Ghiglione did
     not find a gun in Ghiglione's vehicle.  Therefore, we conclude that Pray has failed to
20   demonstrate that counsel was deficient in any manner.

21        Pray also alleges that trial counsel was ineffective for failing to call Michelle
     Richards ("Michelle"), Ghiglione's girlfriend, to testify at trial.  We conclude that the
22   proffered testimony from Michelle was irrelevant and inadmissible hearsay.  We
     further conclude that it was also a strategic decision on behalf of the defense not to
23   call Michelle.  *See Dolman* [*v. State* 921 P.2d 278, 280-81 (Nev. 1996).]

24        Pray finally alleges that counsel was ineffective for failing to call Stephen
     Jackson ("Jackson"), a friend of Pray's, to testify at trial. Jackson was prepared to
25   testify that he had personally observed a blue truck following Pray on one occasion
     and that he considered William "Bud" Baker to be dangerous.  Even assuming that
26

1    trial counsel was deficient for not calling Jackson to testify, we conclude that Pray has
2    failed to demonstrate that, but for this error, the outcome of the trial would have been
     different.  Therefore, we hold that Pray has failed to show that he suffered any
3    prejudice.

4    ECF No. 21, p. 348-49 (footnotes omitted).  With regard to the allegations involving counsel's

5    failure to call Alan Richards and Jim Thomas, the court added these footnotes:

6            [Footnote 3:]  Pray also argues that defense counsel was ineffective for failing
         to call Alan Richards ("Richards"), Michelle's brother, to testify at trial.  However,
7        the record very clearly states that Richards could not be located for trial.  As a result,
         his testimony from a preliminary hearing was read into the record.  Therefore, we
8        conclude that Pray has failed to show that his counsel was deficient.

9
             [Footnote 4:]  Pray also argues that trial counsel was ineffective for failing to
10       call Jim Thomas ("Thomas") to testify at trial.  However, Pray clearly states that
         Thomas was available to testify should any of the relevant witnesses recant their
11       previous statements.  Because Pray does not allege that any of the witnesses recanted
         their testimony, counsel's decision to not call Thomas was reasonable.
12

13   *Id.*

14        Here again, the Nevada Supreme Court applied the correct federal law standard.  In addition,

15   fair-minded jurists could conclude that the court reached the right decision in determining that Pray

16   was not deprived of effective assistance of counsel as a result of counsel failing to call the designated

17   witnesses.  Because Thomas's knowledge about the case was based on what other people had told

18   him, it is unlikely that he would have been able to provide admissible testimony helpful to Pray's

19   case.  Pray has not shown that the state court's conclusions regarding the remaining proposed

20   witnesses were so erroneous that relief from this court is warranted.[3]  *See Richter*, 131 S.Ct. at 786-

21

22        [3] Pray cites to Jim Thomas as the source for the testimony that Neil Stiller, Michelle Richards,
     and Stephen Jackson would have supposedly been able to provide.  ECF No. 56, p. 29-32; ECF No. 86,
23   p. 26-29.  While Pray's pleadings reference Exhibit 44 and a "Jim Thomas Affidavit," the only document
     generated by Thomas located at Exhibit 44 is a letter from Thomas addressed to defense counsel.  ECF
24   No. 21, p. 142-44.  The letter does not mention Stiller or Jackson.  It does mention Michelle Richards,
     but does not support Pray's allegations as to the testimony she would have been able to provide.  Instead,
25   Thomas states in the letter, "Over the period of time that I was dealing with Michelle Richards, it
     became apparent to me that she was mentally unbalanced and that I would be unable to trust any
26

87 ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

*Ground Six(E)*

Ground Six(E) alleges that counsel was ineffective in failing to seek a mistrial due to improper juror contact with the victim's family and with the prosecutor's investigator. As noted above, this claim was subject of an evidentiary hearing conducted in state district court in Pray's first state post-conviction proceeding. The state district court issued a written decision recounting the evidence, which included testimony from six of the 12 jurors and affidavits from the remaining six. ECF No. 21, p. 484-88.

Addressing the issue on appeal, the Nevada Supreme Court stated as follows:

> On May 25, 2001, the district court conducted an evidentiary hearing. At the evidentiary hearing, the district court heard testimony from numerous witnesses including Pray, Pray's brother-in-law, Pray's sister, the victim's mother, the victim's sister, and six of the twelve jurors. [Footnote 4 – The remaining six jurors submitted notarized affidavits because they were unavailable to testify. We note that neither party to this appeal has provided this court with the affidavits. On appeal, however, neither party disputes the contents of the affidavits. Accordingly, we have resolved this issue without reviewing the affidavits based on the parties' discussion of the contents of the affidavits.] On June 21, 2002, the district court denied the petition, finding trial counsel was not ineffective for failing to move for a mistrial on the grounds of juror misconduct. Specifically, the district court found no credible evidence of juror misconduct because the six jurors who testified each stated that he or she: (1) did not have communications with anyone outside the jury; and (2) did not observe any other jurors communicating with anyone outside of the jury. [Footnote 5 – Although Pray, his sister, and brother-in-law testified about several instances of juror misconduct, the district court did not find that testimony credible. *See generally Williams v. State*, 113 Nev. 1008, 1014, 945 P.2d 438, 442 (1997) (noting that

information which she did furnish me." *Id*., p. 142.

While Pray's errors in citing to the record are bothersome, the lack of supporting evidence does not impact in any way this court's conclusions as to the deference to be afforded the state supreme court's determinations. Even if Pray is able to substantiate his claims as to the testimony the witnesses would have been able to provide, the Nevada Supreme Courts conclusions are still entitled to deference under 28 U.S.C. § 2254(d).

1    determining the weight and credibility to give conflicting testimony is within the
2    province of the trier of fact, and credibility determinations will not be reversed absent
     clear error).]

3         The district court's factual findings regarding a claim of ineffective assistance
     of counsel are entitled to deference when reviewed on appeal.  [Footnote 6 – *See Riley*
4    *v. State*, 110 Nev. 638, 647, 878 P.2d 272, 278 (1994).]  Pray has not demonstrated
     that the district court's findings of fact are not supported by substantial evidence or
5    are clearly wrong.  [Footnote 7 – *See id.*]  Moreover, Pray has not demonstrated that
     the district court erred as a matter of law.  [Footnote 8 – *See id.*]

6

7    ECF No. 21, p. 545-46

8         The Nevada Supreme Court's decision on this claim is unassailable and stands as a

9    paradigmatic example of one to which the federal court must defer under 28 U.S.C. § 2254(d).

10   Relief is denied with respect to Claim Six(E).

11        *Grounds Six(G)(1), Six(H), and Ground Six(I)*

12        Grounds Six(G)(1), Six(H), and Six(I) allege ineffectiveness based on counsel's alleged

13   failure to investigate and present certain facts that would have supported Pray's self-defense  theory.

14   With these claims, Pray alleges that counsel was ineffective in failing to present evidence showing

15   that the victim was known to carry a gun and had a reputation for violence, evidence of the victim's

16   habit of cocaine use and his relationship with Michelle Richards, and the testimony of Michelle

17   Richards as to ceratin facts.

18        Pray relies upon information provided by former neighbors of the victim (the Cravens) as

19   evidence that the victim was known to carry a gun and had a reputation for violence.  The Nevada

20   Supreme Court, having cited the *Strickland* standard, addressed this aspect of Pray's ineffective

21   assistance claim as follows:

22        Pray also alleges that trial counsel was ineffective for failing to contact the
     Cravens because they possessed evidence that Ghiglione was known to carry a gun
23   and had a reputation for violence. In  light of our previous conclusion that Craven's
     testimony was inadmissible, we conclude that this argument lacks merit.

24

25

26

20

1   ECF No. 21, p. 351.  For the reasons discussed below in relation to Ground Seven, this was a

2   reasonable application of federal law.

3          As for counsel's alleged failure to present evidence of the victim's habit of cocaine use and

4   his relationship with Michelle Richards, the Nevada Supreme Court decided as follows:

5              Pray next alleges that trial counsel was ineffective for failing to present
            evidence of Ghiglione's alleged cocaine use and his relationship with Michelle.  We
6           conclude that testimony regarding Ghiglione's alleged drug use or the likelihood that
            Ghiglione would follow Michelle is not the type of reputation evidence contemplated
7           by NRS 48.045(1)(b).  Therefore, we find that Pray has failed to demonstrate that trial
            counsel was deficient.

8

9   ECF No. 21, p. 349-50.[4]  Once again, Pray has not shown that this decision was contrary to, or

10  involved an unreasonable application of, federal law.

11         Grounds Six(G)(1), Six(H), and Six(I) are denied.

12                          **Ground Seven**

13         In Ground Seven, Pray claims that the prosecutor withheld exculpatory evidence from

14  defense counsel in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Specifically, Pray alleges

15  that a former neighbor of the victim had contacted the prosecutor about the victim's short temper and

16  propensity for violence, but that the prosecutor never passed this information along to defense

17  counsel.

18         Pray's investigator in his first state post-conviction proceeding, Robert Temple, interviewed

19  the neighbor, Mark Craven, and his wife in 1998.  Pray submitted Temple's affidavit with his state

20  petition.  ECF No. 21, p. 155-58.  According to that affidavit, Craven related to Temple three

21  separate incidents involving Peter Ghiglione:  an argument between Ghiglione and Ghiglione's wife

22  that prompted Craven and his wife to call the police, a threat to "physically beat up [] Craven" issued

23

24         [4] Pray's allegations under Ground Six(I) regarding counsel's failure to present the testimony of
    Michelle Richards are, in essence, a reiteration of allegations included in Ground Six(C).  The Nevada
25  Supreme Court's treatment of those allegations and this court's conclusions as to such are set forth in
    this court's discussion of Ground Six(C), above.

26

1   after Ghiglione saw Craven trying to distract Ghiglione's barking dog by throwing pebbles, and a

2   statement Ghiglione made when Craven asked him to stop shooting pigeons off his roof (which

3   Craven perceived as a threat).  *Id*.  The affidavit also states that Craven and his wife described

4   Ghiglione as "a very physical and volatile man" and that Craven was of the opinion that Ghiglione

5   would "go after" a person if he had a problem with that person.  *Id*., p. 156.

6         As for Craven providing this information to the prosecutor, the affidavit states that Craven

7   told the investigator that he "wrote to [the prosecutor], left phone messages and personally left a

8   written message with the DA's office requesting a call back."  *Id* at 156-57.  According to the

9   affidavit, the prosecutor never responded.  *Id*.

10        A prosecutor's obligation to disclose information favorable to the defense is well-established

11  under *Brady* and its progeny.  *See*, *e.g.*, *Giglio v. United States*, 405 U.S. 150 (1972) and *Kyles v.*

12  *Whitley*, 514 U.S. 419 (1995).  As explained by the Ninth Circuit Court of Appeals in *Carriger v.*

13  *Stewart*, 132 F.3d 463 (9th Cir. 1997):

14        The prosecution is obligated by the requirements of due process to disclose
       material exculpatory evidence on its own motion, without request.  *See Kyles v.*
15     *Whitley*, 514 U.S. 419, 432-34 (1995); *United States v. Bagley*, 473 U.S. 667, 682
       (1985).  Evidence is material, and must be disclosed, "if there is a reasonable
16     probability that, had the evidence been disclosed to the defense, the result of the
       proceeding would have been different."  *Kyles*, at 433; *Bagley*, 473 U.S. at 682.  A
17     "reasonable probability" does not require showing by a preponderance that the
       outcome would have been different.  *See Kyles*, at 433-35.  Rather, a " 'reasonable
18     probability' is a probability sufficient to undermine confidence in the outcome."
       *Bagley*, 473 U.S. at 682.

19

20  *Id*. at 479.

21        In addressing this claim on appeal in Pray's first state post-conviction proceeding, the Nevada

22  Supreme Court concluded as follows:

23        As his final argument, Pray alleges that the State violated his due process
       rights by concealing exculpatory evidence.  Pray argues that Mark Craven ("Craven"),
24     a former neighbor of Ghiglione, who possessed exculpatory evidence, contacted the
       State.  "It is a violation of due process for the prosecutor to withhold exculpatory
25     evidence, and his motive for doing so is immaterial."  *Wallace v. State*, 88 Nev. 549,

26

1    551-52, 501 P.2d 1036, 1037 (1972).  This court has held that "[a] prosecutor must
     disclose evidence favorable to an accused when that evidence is material either to
2    guilt or to punishment."  *Roberts v. State*, 110 Nev. 1121, 1127, 881 P.2d 1, 5 (1994).
     "In determining whether material should be considered *Brady* material, the court
3    should look at the following elements:  '(a) suppression by the prosecution after a
     request by the defense, (b) the evidence's favorable character for the defense, and (c)
4    the materiality of the evidence.'"  *Homick v. State*, 112 Nev. 304, 314, 913 P.2d 1280,
     1287 (1996) (quoting *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972)).
5
6          We conclude that the information held by Craven would be inadmissible
     character evidence under NRS 48.045(1)(b).  NRS 48.045(1)(b) permits the
7    admission of the deceased victim's general character offered by the accused, whether
     the accused had knowledge of the victim's character or not.  *See id.*  However, in this
8    instance, Craven's proffered testimony was of specific instances of violence.
     Therefore, we conclude that they would not have been admissible because Pray was
9    not aware of them prior to the shooting.  Accordingly, we find that the district court
     did not err by failing to grant Pray's petition for a writ of habeas corpus.

10   ECF No. 21, p. 350-51 (footnote omitted).

11          Pray argues that the Nevada Supreme Court's decision is not entitled to deference because the

12   court premised its decision on an erroneous application of state evidence law and "failed to analyze

13   [the] claim specifically under the Supreme Court's decision in *Brady*."  ECF No. 86, p. 37-38.  This

14   argument misses the mark.

15          The Nevada Supreme Court did, in fact, analyze the claim under *Brady*.  It merely concluded

16   that the undisclosed evidence was not material under *Brady* because it was inadmissible at trial.  This

17   was a reasonable application of federal law.  *See Wood v. Bartholomew*, 516 U.S. 1, 6 (1995)

18   (holding that state's failure to disclose results of witness's polygraph test did not deprive defendant of

19   "material" evidence under *Brady* rule because the results were been inadmissible under state law).

20   As for whether the Nevada Supreme Court was wrong in concluding that the evidence was

21   inadmissible, this court is bound by the state court's interpretation and application of its own laws.

22   *See Williams v. Calderon*, 52 F.3d 1465, 1480-1481 (9th Cir. 1995).  Accordingly, the state court's

23   determination on that point may not be second-guessed.

24          Ground Seven is denied.

25   \ \ \

26
                                                  23

1    IV.  CONCLUSION

2        For the reasons set forth above, Pray's petition for habeas relief is denied.

3                              *Certificate of Appealability*

4        This is a final order adverse to the petitioner.  As such, Rule 11 of the Rules Governing

5    Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA).

6    Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the

7    issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir.

8    2002).

9        Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a

10   substantial showing of the denial of a constitutional right."  With respect to claims rejected on the

11   merits, a petitioner "must demonstrate that reasonable jurists would find the district court's

12   assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484

13   (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA

14   will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the

15   denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

16       The COA standard is not high.  Pray must only "'sho[w] that reasonable jurists could

17   debate'" the district court's resolution or that the issues are "'adequate to deserve encouragement to

18   proceed further.'"  *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc) (citations

19   omitted).  Having reviewed its determinations and rulings in adjudicating Pray's petition, the court

20   finds that the *Slack* standard is met with respect to the court's denial of Ground Six(B).  The court

21   therefore grants a certificate of appealability as to that issue.  The court declines to issue a certificate

22   of appealability for its resolution of any procedural issues or any of Pray's other habeas claims.

23       **IT IS THEREFORE ORDERED** that petitioner's second amended petition for writ of

24   habeas corpus (ECF No. 56) is DENIED.  The Clerk shall enter judgment accordingly.

25

26

24

1
   **IT IS FURTHER ORDERED** that a certificate of appealability is issued as to the court's

2
denial of Ground Six(B).

3
   Dated March 12, 2014.

4

5

6
_____
UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

25